**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**-vs-**  Case No. **6:07-cr-211-Orl-22DAB**

**LUIS M. CANDELARIO**
**THOMAS E. VANDER LUITGAREN**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration following an evidentiary hearing on the following motion filed herein:

> **MOTION:** **MOTION TO DISMISS (Doc. No. 37)**
>
> **FILED:** **December 28, 2007**
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

### *PROCEDURAL BACKGROUND*

On December 28, 2007, Defendant Vander Luitgaren (herein Defendant or Luitgaren) filed the instant Motion to Dismiss Indictment and Request for a *Kastigar*[1] Hearing. The government filed a Response in Opposition on January 4, 2008 (Doc. No. 49). The undersigned granted the request for an evidentiary hearing (Doc. No. 113), which was held March 12-13, 2008 (Doc. Nos. 114-15), and the parties have further briefed the issues (Doc. Nos. 123, 124). The matter is now ripe for resolution.

---

[1] *United States v. Kastigar,* 406 U.S. 441 (1972).

### *FACTUAL BACKGROUND*

Although discussed in more detail in the body of this Opinion, it appears from the testimony and exhibits presented at hearing (*see* Doc. Nos. 114-117) that, while the parties draw different inferences from the facts, the facts as to the course of the government's investigation are largely undisputed.[2]

As summarized by the government in its papers, on October 22, 2004, well prior to the proffer at issue here, Defendant's employer, AK Specialty Vehicles, LLC ("AKSV"), submitted a voluntary disclosure report to the General Services Administration, Office of Inspector General ("GSA-OIG"), which detailed AKSV's internal investigation into an alleged secret kickback scheme between Defendant and Co-Defendant Luis Candelario (herein Co-Defendant). According to the Indictment (Doc. No. 1), Co-Defendant's employer, JPS Communications, Inc., subcontracted work to AKSV on a Virgin Islands government homeland security contract. The Indictment asserts, among other things, that Defendant, who represented AKSV during the contract, made secret kickback payments to Co-Defendant for granting the subcontract to AKSV. The Indictment further asserts that Co-Defendant made "return kickback payments of $30,000" to Defendant for arranging the kickback payments to Co-Defendant (Doc. No. 1 at 5).

The voluntary disclosure report provided to the government included bank records, AKSV business records, and AKSV e-mails allegedly indicating that Defendant, through AKSV, made approximately $340,000 in secret payments to Co-Defendant (Government's Exhibit 1). As a result of AKSV's disclosure, and prior to the proffer at issue here, Special Agents Michael Dorney and

---

[2]The motives behind and implications of Defendant's financial transactions with his Co-Defendant, on the other hand, are strongly contested.

William Woolard of the GSA-OIG conducted an investigation into the matter, including extensive witness interviews (19 witnesses from five companies) as well as extensive document review.

On December 6, 2005, still prior to the proffer at issue, Special Agent Dorney served a federal grand jury subpoena on Bank of America for the bank records of Defendant. On February 13, 2006, Bank of America provided Special Agent Dorney with bank records indicating that Defendant received two $15,000 payments from Co-Defendant (*See* Government's Exhibit 3). The payments were bank checks, dated March 22, 2004, and May 24, 2004, which purport to be from Co-Defendant, payable to the Order of Defendant. The government asserts that these payments coincided with Defendant making two equal kickback payments of $168,823.50 to Co-Defendant (on March 10, 2004, and May 21, 2004, respectively). (Government's Exhibit 1.)

On February 28, 2006, the special agents interviewed Defendant at his home without counsel present and before Defendant sought representation in this matter.[3] During this interview, according to the government, Defendant admitted to making improper payments to Co-Defendant in the amount of approximately $340,000. After the special agents showed Defendant copies of his bank records, he also allegedly admitted to receiving two improper commission payments of $15,000 each from Co-Defendant. Allegedly, Defendant did not indicate at that time that the $30,000 was a personal loan from Co-Defendant for the purpose of purchasing and restoring an automobile.

On March 1, 2006, the special agents served Defendant with a federal grand jury subpoena to testify before the grand jury. Thereafter, Defendant obtained counsel (Defendant's Exhibit D) and negotiated a proffer agreement with the United States Attorney's Office in the Middle District of Florida (Defendant's Exhibits F, G, and I). The proffer agreement provides, in part, that "in the event

---

[3] Defendant was represented by counsel in a civil action arising out of termination of his employment. Middle District of Florida Case No. 6:05cv185-ACC-KRS.

-3-

Thomas Vander Luitgaren is prosecuted, the government will not offer in evidence during its case-in-chief, or in aggravation of Thomas Vander Luitgaren's sentence . . . any statements made and/or information provided by Thomas Vander Luitgaren at the interview, and any information directly and indirectly derived therefrom," subject to an exception for use in a prosecution for false statement, obstruction of justice, or perjury or to impeach any contrary testimony in the event Defendant offers testimony materially different from his statements in the proffer. (*See* Defendant's Exhibit I for full text).

On March 29, 2006, Defendant was interviewed at the Offices of the United States Attorney by the Government under the terms of this proffer letter and was represented by counsel. Assistant United States Attorney Carlos Perez was present, as was Special Agent Dorney. According to the Government, the scope of this interview rested solely upon information the Government had already obtained prior to the interview, and the interview centered on Defendant's explaining evidence presented to him by the Government. It is undisputed that the Government went over the substance of Defendant's previous interview. At the proffer, when asked about the $30,000 payments he received from Co-Defendant, Defendant advised that the $30,000 payment from Co-Defendant was a personal loan from Co-Defendant, to purchase and restore a Corvette (Defense Exhibit Z). Defendant asserts that in addition to orally communicating this information, he provided (either at the proffer or shortly thereafter) "tangible evidence" to the Government, including a document related to the purchase and restoration of the Corvette, a cancelled check dated March 10, 2006, from Defendant's wife to Co-Defendant, in the amount of $30,000, with a notation "loan repayment in full," and a copy of a personal note from Defendant's wife to Co-Defendant, referencing "repayment

of the loan to Tom" and apologizing for "not being able to repay you sooner" (Defense Exhibits K, L ,N, O, Q, R and S; Government's Exhibit 10, Grand Jury Exhibit 18).[4]

The Government asserts that this information "directly conflicted with defendant Vander's earlier admission that he received the money as an improper commission on the Virgin Islands contract" and notes that this "repayment" came "just days after his first interview with agents and after receiving the grand jury subpoena" (Doc. No. 123 at 4). On the other hand, Defendant's wife testified at the *Kastigar* hearing, confirming that Defendant did receive a loan and was innocent of any wrongdoing.

On December 5, 2007, Special Agent Woolard (not Special Agent Dorney) appeared before the grand jury and testified about Defendant's statements regarding the alleged loan. The March 10th check and note from Defendant's wife was presented to the Grand Jury (*See* Government Exhibit 10, Grand Jury Exhibit 18).

The Government contends that every overt act alleged in the indictment and every exhibit used in the grand jury proceeding, except Grand Jury Exhibit 18, came from sources and evidence received prior to the immunized evidence provided by Defendant, and the immunized statement and documents provided no leads in this investigation. According to the Government, other than the information regarding the alleged loan, no part of Defendant's immunized statement or documents were used to develop leads, develop witnesses, indict, or build a case against the Defendant. At the *Kastigar* hearing, Attorney Kurosad testified that the Government was required by Department of Justice policy to present Defendant's statements regarding the alleged loan and supporting documents to the grand jury, as exculpatory evidence.

---

[4] Defendant also provided copies of civil depositions of Mr. Sodomire and Defendant, with exhibits, but AUSA Perez could not recall if the depositions were provided to Special Agent Dorney.

Defendant contends that the Government made actual direct use, as well as indirect use, of admittedly immunized statements and documents, and thus "tainted" the grand jury, and this prosecution. It is the Government's burden to prove otherwise.

### *STANDARDS OF LAW*

The prosecution of a witness who previously has given self-incriminating testimony pursuant to a grant of immunity raises a serious Fifth Amendment issue. "In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that such a prosecution was allowable, but the prosecution is prohibited from 'using the compelled testimony in *any* respect' that would 'lead to the infliction of criminal penalties on the witness.'" *United States v. Schmigdall,* 25 F. 3d 1523, 1528 (11th Cir. 1994), *citing Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis original). Once a Defendant establishes that he has testified under immunity, the prosecution bears the burden of showing that its evidence is not tainted. This is done by establishing the existence of an independent, legitimate source for the disputed evidence. *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665. The Government is required to prove an absence of taint by a preponderance of the evidence. *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985).

In carrying that burden, the Government is not required to negate every abstract possibility of taint. *United States v. Schmidgall,* 25 F. 3d 1533, 1538 (11th Cir. 1994) (*Schmidgall II)*, *citing Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985). On the other hand, the Government's conclusory denials regarding the use of immunized testimony, without more, are not sufficient. *United States v. Hampton,* 775 F.2d 1479, 1489 (11th Cir. 1985). Proof of reliance on information gathered prior to the taking of immunized testimony generally is sufficient for the Government to carry its burden. *Schmidgall II,* 25 F.3d at 1537; *Byrd*, 765 F.2d at 1529. Finally, even if immunized testimony was in fact used, an indictment or conviction may be upheld on a finding that the use of such tainted

evidence was harmless beyond a reasonable doubt. *Schmidgall,* 25 F.3d 1523 at 1529; *Byrd,* 765 F.2d at 1529, n. 8.

### *ANALYSIS*

As to the indictment and the apparent tenor of the government's case-in-chief, the *Kastigar* analysis is, with one caveat, not difficult. Consistent with the requirements of *Kastigar,* the government established that all of the elements and evidence of its proof as set forth in the indictment were developed and in hand prior to the immunized proffer session. It is quite clear that the government simply has not and, as of now,[5] does not rely on any information from the proffer as part of its case against Defendant. Each of the events and circumstances detailed in the indictment was derived from and supported by the voluntary disclosure report submitted to GSA and the ensuing investigation.

The only new information from the proffer was Defendant's claim that the two $15,000 payments to him were loans, unrelated to the vehicle purchase contract. Defendant intended this information to be exculpatory. As such, it has no logical place in the government's case, buttressing the conclusion that the government did not rely on the proffer in order to get the grand jury indictment and prosecute the case to this point.

The caveat to this analysis are the undisputed facts that the government did present Defendant's contentions about the loan to the indicting grand jury and that the current prosecutors and agents are fully acquainted with the immunized proffer, contrary to the recommended practice for prosecuting individuals who received use immunity. *See, e.g., United States v. Byrd,* 765 F.2d 1524 (11th Cir. 1985) ( warning that it is unwise to permit an attorney familiar with immunized information

---

[5] The *Kastigar* issue does not disappear upon disposition of this motion. At trial, the government remains obliged to avoid any use of information derived directly or indirectly from the proffer.

to participate in prosecution).  Nonetheless, where the government has meant its burden of showing independent sources for each piece of evidence and the immunized information was self serving and of no real value to the investigation, there is no absolute bar.  *See United States v. Caporale,* 806 F.2d 1487 (11th Cir. 1986), *cert. denied,* 483 U.S. 1021 (1987).  *See also United States v. Bartel,* 19 F.3d 1105 (6th Cir. 1994).

The government defends its presentation of the Defendant's loan contentions as part of its obligation to provide the grand jury with potentially exculpatory information.  While this is technically plausible, the grand jury transcript does not reflect that the information was presented in that vein.  Rather, the account of the loan was presented as in the sequence of Defendant's explanations of events, perhaps, by implication, to undermine his credibility.  This does not, however, represent the type or degree of "taint" necessary to establish a *Kastigar* violation.  In light of the well developed and documented inculpatory record, any error in presenting the proffer information to the grand jury in this fashion was harmless.

The other assertions of violations are insubstantial.  Defendant has not provided any evidence and the circumstances do not suggest any contradiction of the government's showing that evidence from alleged co-conspirator Rodriguez-Vasquez was not influenced by information from the proffer.  There is no indication that deposition transcripts from the civil case have had any effect on this prosecution, even if the government's knowledge of their existence or content were deemed fruits of the proffer.  Finally, Defendant's efforts to divine the mental processes of the agents and prosecutors are unavailing simply because the evident disdain of the government for the loan explanation-- prosecutors and agents who disbelieve this evidence cannot be said to be relying on it.

Based on this analysis, there is no occasion to address the government's alternative assertion that Defendant's false statements about the loan during the proffer vitiate the immunity agreement entirely.

An additional matter should be noted. The issue of use of information from the proffer may surface at trial in a different context. If Defendant offers evidence to explain the $15,000 checks as loans, the government likely will seek to refute or rebut such evidence. It is beyond the scope of this Report and Recommendation to determine any issues that may arise in that event.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Orlando, Florida on this 21st day of March, 2008.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy